Harry Onyschuk, Administrator of the Estate of Mary Onyschuk, Deceased, Appellee, v. A. Vincent Sons Company et al., Defendants.
Appeal of J. K. Sharkey, Appellant.

Gen. No. 37,391.

Opinion filed November 27, 1934.

MILLER, GORHAM, WALES & ADAMS, for appellant; EDWARD R. ADAMS and HERBERT C. DEYOUNG, of counsel.

MITANG & BASKIN, for appellee.

MR. PRESIDING JUSTICE GRIDLEY delivered the opinion of the court.

On May 20, 1932, the Union Bank of Chicago, as administrator of the estate of Mary Onyschuk, deceased, commenced an action against the four defendants to recover damages for negligently causing the death of the intestate as the result of an automobile collision, which occurred in Chicago about 1:30 o'clock in the afternoon of August 6, 1931. Each defendant separately pleaded to the declaration. Several months prior to the trial, by stipulation between plaintiff and

A. Vincent Sons Co. (hereinafter called the Garage Co.), it was ordered that the suit be dismissed as to it. During the trial before a jury in October, 1933, Harry Onyschuk, having become the administrator of the intestate's estate in place of the bank, was substituted as plaintiff in the action, and on his motion, and at the conclusion of plaintiff's evidence, the suit also was dismissed as to Joseph Dykton, father of Joseph Dykton, Jr., and owner of one of the automobiles involved in the collision, and the trial proceeded as to the two remaining defendants, J. K. Sharkey and Joseph Dykton, Jr. The jury returned a verdict finding both of them guilty and assessing plaintiff's damages at the sum of $2,500. On November 4, 1933, after overruling Sharkey's motions for a new trial and in arrest of judgment, the court entered judgment upon the verdict against both of the defendants. Sharkey alone has perfected an appeal from the judgment.

The declaration consisted of four counts. In the first count it is alleged in substance:

That on August 6, 1931, plaintiff's intestate, a girl of the age of 11 years, was standing with others on the west sidewalk of South State street ( a north and south street) and south of its intersection with 111th street (an east and west street) ; that Joseph Dykton, by his agent or servant, Joseph Dykton, Jr., was then and there operating an automobile (hereinafter called the Nash car) westerly upon 111th street and in the intersection; that the Garage Co. and J. K. Sharkey, "by their agent or servant" (Donald Brunette), were then and there operating another automobile (hereinafter called the Packard car) in a southerly direction on South State street and in the intersection; and that while the intestate, exercising due care for her own safety, was standing on the sidewalk, defendants so negligently operated the two automobiles that the Nash car ran into and collided with the Packard car

with such force that the Packard car struck the intestate on the sidewalk, knocked her down and so severely injured her that she died on the same day. And plaintiff further averred that the intestate left her surviving Harry Onyschuk, her father, and Michael Onyschuk, her brother, who are her only heirs-at-law and next of kin, and who are still living, etc.

The other counts contained similar allegations. In the second the particular negligence charged is the negligent operation of both cars "at a rate of speed greater than was reasonable and safe through Chicago, an incorporated city in Illinois, contrary to the statute," etc. In the fourth count the gist is the wilful and wanton negligence in the operation of both cars.

To the declaration, in addition to filing pleas of the general issue, the Garage Co., Sharkey and Joseph Dykton, Sr., filed separate special pleas. The Garage Co. denied that it, or any agent or servant of it, owned, operated, possessed or controlled the Packard car at the time and place. Sharkey denied either he, or any agent or servant of his, then operated or controlled the Packard car. Joseph Dykton, Sr., denied that he, or any agent or servant of his, was then in the control, use or possession of the Nash car. The only plea of Joseph Dykton, Jr., was that of the general issue.

On the trial it appeared that neither of the owners of the cars, Sharkey and Joseph Dykton, Sr., was in them at the time. Plaintiff called two witnesses as to the details of the accident, Cornelius Von Baardwik and Fred Henriksen, and they testified at considerable length on direct and cross-examination. Sharkey took the position that the driver of his car, Brunette, was not then his agent or servant, but was the agent or servant of the Garage Co., which was then the bailee of the car for the purpose of greasing it and making repairs upon it. Plaintiff took the position in substance that while shortly prior to the accident Sharkey

had personally brought his Packard car to the shop of the Garage Co. on 115th street, Chicago, for the purpose mentioned, he then requested *as a favor* that some employee of the Garage Co. drive him in the car to his nearby home, leave him there, and return to the shop with the car; that the foreman of the shop acceded to the request and assigned Brunette (an employee of the Garage Co.) to the act of driving Sharkey to his home, etc.; that the car left the shop, with Sharkey in it and Brunette driving it; that on the way to Sharkey's home, at his direction, Brunette stopped the car at a barber shop in the vicinity and Sharkey got out of the car and told Brunette to drive it back to the shop, which he attempted to do; that on the return trip the accident happened; that the Garage Co. had temporarily *loaned* Brunette to Sharkey to act as his chauffeur; and that, hence, at the time of the accident, the Packard car was being operated by Sharkey's servant. In support of plaintiff's position his witness, Von Baardwik, testified in part as follows:

"The police took my name at the time of the accident. . . . I saw Sharkey in the Criminal Court and had a conversation with him shortly after the accident. We were talking together, four or five of us, while we were waiting there. And he was telling us that 'he took his Packard car down to Vincent's Garage to have it repaired, that he went to the foreman and *asked him if he could get somebody to take him home,* that on the way home he asked the driver if he could stop at the barber shop, that he went into the barber shop, saying, "You can go back," and that the driver went back with the car'; and that is all I hear about it."

While plaintiff was on the stand, and after he had testified as to the heirs and next of kin of the intestate, etc., he was asked if the Garage Co. had not been one of the defendants originally sued. Upon his replying

that he "didn't understand," he was further asked: "Have you received some money in settlement already on account of this accident?" After the objection of plaintiff's attorney to the question had been overruled, the judge and counsel had some conversation not in the jury's presence and immediately thereafter before the jury respective counsel entered into the following stipulation:

"It is stipulated, gentlemen, in order to save asking the witness the question, because he might or might not understand it fully, that the plaintiff in this case has already received, *on account of this lawsuit,* in so far as it was against A. Vincent Sons Co., garage owners, the sum of $1200."

At the close of plaintiff's evidence Sharkey moved for a directed verdict in his favor, but the motion was denied. Thereupon Sharkey called as witnesses John Carleton and Peter Cook (eyewitnesses to the accident); Lewis L. Mills (a shorthand reporter); and Brunette (the driver of the Packard car.) Sharkey also testified in his own behalf. The other remaining defendant, Joseph Dykton, Jr., testified in his own behalf. No other witness was called by him. The pertinent portions of the testimony of Brunette on direct examination are in part as follows:

"I came into the garage around noon. Mr. Lewis, the foreman, asked me if I would drive Sharkey home *after he left the car for repairs there.* . . . I left the garage with Sharkey. . . . While going to his home *he asked me* to take him to the barber shop, at 105th and Michigan. . . . I dropped him off there. . . . He knew I was going back with the car to the garage for repairs. . . . I came back on State street and went south. As I got to 111th street I slowed down to around 20 or 25 miles an hour, and all at once I seen a Nash car, back of me, come right towards me and hit me. The Nash hit the rear end of

the Packard, which was pretty near past the street car line, and the Packard car spun around, landed on top of the sidewalk, and the Nash tipped over.''

Sharkey's testimony is in part as follows:

''My address is 10458 South State street. . . . I was not in my car at the time of the accident. . . . I drove the car to Vincent's garage *for inspection and greasing and a little repair.* . . . At first I refused to take any favor from the foreman at Vincent's. After he kept urging me, I said all right. . . . I did not tell Brunette to take me to the barber shop. When he was passing the barber shop, *I asked him to stop and let me out,* and then I got out and went into the barber shop, and Brunette turned to the west and went into State street to go back to the garage. . . . I did not testify at a previous trial that I told him to take the car back to the garage after he had let me off at the barber shop. . . . I had driven the car to the garage for repairs and he knew where the car was to go.''

At the close of all the evidence Sharkey renewed his motion for a directed verdict on the theory that he was under no liability to plaintiff in the present suit. The motion was again denied by the court. And, after certain instructions had been given to the jury, the verdict and judgment followed as first mentioned.

The main contention of counsel for Sharkey is that the court erred in refusing to direct a verdict in favor of Sharkey at the close of all the evidence. In support of their contention counsel cite, among others, the case of *Perry v. Fox,* 156 N. Y. S. 369. From the opinion in that case it appears in substance that Perry commenced an action against Fox to recover for damage done to his automobile. There had been a collision between it and Fox's automobile, which at the time was being driven by one Hill, who was a mechanic and the keeper of a garage. On the day of the acci-

dent Fox noticed that the carburetor of his car was out of order and needed some adjustment, and he drove from his home to Hill's garage, where he picked up Hill, who rode with him to a country club. Fox there turned over the car to Hill to make the necessary repairs and Hill took possession of it for that purpose and started back to his garage. On the trip back he negligently caused the car to collide with Perry's car, resulting in damage to it. In the trial court Perry recovered a judgment against Fox, but on appeal the judgment was reversed and Perry's complaint ordered dismissed. In reversing the judgment the Appellate Court said (p. 371, italics ours):

"The testimony, considered as a whole, presents no contradiction of fact, *nor does it present a condition of facts from which contradictory inferences can be drawn.* The ultimate fact is that defendant told Hill to take his automobile and repair it, knowing the repairs were to be made at Hill's garage, at some distance from the place of delivery.

"It is undisputed that the car was turned over to Hill at the country club. It is undisputed that Hill had an established separate business, that of keeping a garage for the repair of automobiles. When Fox delivered the automobile to Hill, he parted with all control over it. He retained no supervision over Hill as to the manner or method of the car being put in repair, or being brought to the repair shop of Hill. In my opinion, the sole relation existing between Fox and Hill was that of a bailor and bailee. It is a matter of daily occurrence for a garage man to take possession of automobiles *either at the owner's residence, on the road, or at the bailee's shop.* As to injuries to third persons caused by the negligence of the bailee, there is no liability upon the part of the bailor." (Citing a New Jersey case, to which may be added the case of *Mansfield v. Shapiro,* 234 Ill. App. 596, 604.)

But we are of the opinion that the evidence in the present case, unlike that in the *Perry* case, at least presents "a condition of facts from which contradictory inferences can be drawn" on the ultimate question whether or not Brunette, the driver of the Packard car at the time of the accident, was then the servant of Sharkey, and that that question was one for the jury and not the court to determine. A case somewhat similar in its facts is that of *Watson v. Trinz,* which has been twice before this court (262 Ill. App. 630, and 274 Ill. App. 379). In that case Watson sued the Marigold Garage Co. and Trinz and his wife to recover damages for personal injuries sustained in an automobile accident. On the first trial before a jury the Garage Co. was found not guilty, but there was a verdict and judgment against the Trinzes. On writ of error we reversed the judgment and remanded the cause for reasons stated in our unpublished opinion. On the second trial a jury returned a verdict finding the Trinzes guilty and assessing plaintiff's damages at $28,000. Again the Trinzes sued out a writ of error but we affirmed the judgment, and subsequently, at the June term, 1934, our Supreme Court denied their petition for a writ of certiorari. The main contention raised on the second writ of error was that the driver of the automobile, at the time of the accident, was the servant of the Marigold Garage Co., and not the servant of either of the Trinzes. In discussing the contention we quoted from our former opinion as follows (274 Ill. App. 393, italics ours):

"The law, however, recognizes that a servant in the general service of one may be transferred, under contract or otherwise, to the service of another so as to become *for the time being* the latter's servant, with all the legal consequences of that relationship. (Citing cases.) In *Braxton v. Mendelson,* 233 N. Y. 122, 123-4, it was said: 'Was the servant, whose negligence in-

jured a third party, performing work for his master within the scope of his employment or was he loaned by his master to another to do the latter's business? In the one case the general employer is liable for his torts. In the other he is not. But while the rule is clear its application is often difficult. The true relationship between master and servant may be obscured by circumstances seemingly contradictory.' In the instant case there is some testimony tending to sustain the theory of the plaintiff. Where the facts are *undisputed* the existence of the relationship of master and servant is for the court. (*Woods v. Bowman*, 200 Ill. App. 612 (615), and cases cited.) Under the pleadings and the evidence in the instant case it was a question for the jury. (*Kirn v. Chicago Journal Co.*, 195 Ill. App. 197 (204); *Shannon v. Nightingale*, 321 Ill. 168 (173).)''

And we said in part in our second opinion in the *Watson* case (p. 394):

''In the instant case, while Smith, the chauffeur, at the time of the accident was in the general employ of Marigold Garage, nevertheless, the jury were justified in finding from the evidence that when defendants used an employee of the garage, as they did Smith on the evening in question, the employee for the time being was a servant of defendants, and not a servant of the garage; that a driver on such trips was directed and controlled by defendants and was loaned to them by the garage company as a 'mere accommodation' as patrons of the garage, for which accommodation the garage received nothing.''

In 46 A. L. R., at page 840, there is an annotation with the heading: ''Responsibility of owner of car for negligence of one in general employment of repair man or keeper of garage while getting or delivering car,'' and it is said (italics ours):

"The fact that an employee is the general servant of one employer does not, as matter of law, prevent him from becoming the particular servant of another, who may become liable for his acts. . . .

"But as a general rule the owner of a car is not liable for the negligent driving of his car by a person in the general employment of a garage man while getting or delivering his car. (Citing and discussing cases.)

. " (pp. 841–2.) But it has been held, *under some circumstances,* that a driver in the general employment of a garage keeper was, at the time of the negligence complained of, acting as servant of the owner, so as to make the latter responsible, *or at least the question was for the jury in that regard."* (Citing and discussing cases.)

We have reviewed the cited cases, as well as others wherein the facts are somewhat similar to those in the present case, and we believe that our above holding (that under the evidence in the present case the ultimate question, whether or not Brunette at the time of the accident was the servant of Sharkey, was one of fact for the jury to determine) is in accordance with the weight of authority in this country. And in this connection the following cases may be referred to: *Andres v. Cox,* 223 Mo. App. 1139, 23 S. W. (2d) 1066, 1069, 1070; *Holloway v. Schield,* 294 Mo. 512, 526; *Dalrymple v. Covey Motor Car Co.,* 66 Ore. 533, 541–6; *Marron v. Bohannan,* 104 Conn. 467, 469–71; *Ryciak v. New York Oversea Co.,* 200 N. Y. S. 379; *Rosen v. Diesinger,* 306 Pa. St. 13, 16, 17; *Bailey v. Smith,* 132 S. C. 212, 222, 227.

Counsel for Sharkey also contend that the verdict . of the jury, finding Sharkey guilty, is against the manifest weight of the evidence. The argument is in substance that, assuming Brunette to be Sharkey's servant in driving the Packard car at and immediately be-

fore the time of the accident, the evidence does not show that Brunette was guilty of any negligence at the time. We find no merit in the contention or argument. It appears from a clear preponderance of the evidence that the drivers of the respective cars were each guilty of negligence, which proximately caused or contributed to the collision and the resulting death of plaintiff's intestate. The Packard car, going south on State street, approaching 111th street and entered the intersection at an excessive rate of speed, without much, if any, slackening of speed, notwithstanding there was a "slow-down" sign at the north-west corner of the intersection. The Nash car, driven by Dykton, Jr., and going west on 111th street, approached State street and entered the intersection at a more excessive rate of speed, without any slackening of speed notwithstanding there was a "Stop" sign at the northeast corner. Brunette's testimony on cross-examination is contradictory. He testified: "When I approached 111th street I slowed down and looked to see if there was any traffic coming from the east. I seen the Nash at that time. I thought he was going to stop for the 'Stop' sign. I didn't pay any attention to the Nash or anything. I was just driving and I thought, well, he will stop. I was going my way." He further testified: "It is a fact that I didn't see this Nash car until just before the impact. I don't remember seeing any traffic coming before I started to cross 111th street. After the impact of the machines the Packard car just spun me around right on top of the sidewalk, and a tree stopped the car. The rear bumper took the bark off the tree."

Counsel for Sharkey also contend that the trial court erred in giving to the jury four instructions offered by plaintiff and in the refusal to give three instructions offered by Sharkey. The court gave in all 19 instructions—9 of which were offered by plaintiff and 10 by

Sharkey. We have examined all of the given instructions and are of the opinion that the jury were fully and fairly instructed and that no reversible error was committed in the giving of any of the four instructions mentioned (Nos. 5, 6, 7 and 9), offered by plaintiff. No useful purpose will be served in setting forth and discussing these instructions.

The three refused instructions, offered by Sharkey, and as to which Sharkey's counsel contend that the court's refusal to give each and all constitutes reversible error, are as follows:

"1. You are instructed that if you believe from the evidence that the plaintiff has received some moneys, or an agreement to pay moneys, on account of the alleged injuries for which it has brought suit in this case from some person against whom it has made claim for damages on account of said alleged injuries, then even if you should reach the question of considering damages in this case, you should take *that* into consideration, and if he has received fair compensation for such injuries in the manner aforesaid he may recover only nominal damages in this case; and if you believe from the evidence that he has received *only partial compensation* in the manner aforesaid, he may recover as damages only such sum as taken together with *such partial compensation above referred to* will give him fair compensation *altogether*. (Refused.)

"2. If you believe from the evidence that the plaintiff has made claim against another party other than the defendants for damages on account of the same damages for which he is suing the defendants herein; and if you further believe from the evidence that he has received moneys from such person *in full or partial compensation for his damages,* then if you find any defendant guilty you *must* consider such moneys already received in assessing the damages against this defendant. But the Court does not mean to intimate

that you should assess any damages against any defendant or that you should pass upon the question of damages until after you have decided the question of whether any defendant is guilty or not guilty. (Refused.)

"3. You are instructed that if you should find any defendant guilty then you will have occasion to consider the plaintiff's damages, and in considering that question, if you have occasion to do so, you should consider whatever amount, if any, the evidence may show has been paid or agreed to be paid *as compensation for plaintiff's damages* by anyone else concerned in the accident." (Refused.)

The only evidence that we can find in the present record, upon which these instructions can be based, is contained in the oral stipulation entered into before the jury, just before the close of plaintiff's case, between his counsel and Sharkey's counsel. As above set forth in this opinion that stipulation is, that "the plaintiff in this case has already received, *on account of this law suit,* in so far as it was against A. Vincent Sons Co., garage owners, the sum of $1200." It is not stated in the stipulation, nor does it elsewhere appear, that the sum was paid by the Garage Co. to plaintiff in consideration of a *covenant not to sue* or of a *release.* From the common law record, however, it appears that when the suit was originally commenced the Garage Co. was one of the four defendants sued, and that several months prior to the trial the court, under stipulation, ordered that the suit be dismissed as to it. It is well settled in this State that "where there is suit against several tort feasors the dismissal of the suit against one does not bar the action against the others." (*City of Chicago v. Babcock,* 143 Ill. 358, 366; *West Chicago Street R. Co. v. Piper,* 165 Ill. 325, 328.) It is also well settled that "a *release* to one of several joint tort feasors is a release to all, and an ac-

cord and satisfaction with one of them is a bar to an action against the others." (*City of Chicago v. Babcock, supra; Gore v. Henrotin,* 165 Ill. App. 222, 224.) But it is also said in the *Babcock* case (p. 366, italics ours): "A covenant not to sue a *sole* tort feasor is, to avoid circuity of action, considered in law a discharge, and a bar to an action against such tort feasor. *But the rule is otherwise* where there are two or more tort feasors, and the covenant is with one of them not to sue him. · In such case the covenant *does not operate as a release* of either the covenantee or the other tort feasors, but the former must resort to his suit for breach of the covenant, and the latter can not invoke the covenant as a bar to the action against them." In the present case we think it must be assumed that the $1,200, mentioned in the stipulation as having been received by plaintiff from the Garage Co. was paid in consideration of a covenant not to sue it and not in consideration of any release of it, because, if the latter, further prosecution of the suit against Sharkey would have been barred, and it is not so contended here by counsel for Sharkey.

Counsel for Sharkey, in their printed brief here filed and in support of their contention that the trial court committed reversible error in refusing to give each and all of the three instructions above quoted, make the following argument:

"All of these instructions bear on the question of whether plaintiff received money from a corporation (A. Vincent Sons Co.), originally made a defendant to this suit. The evidence shows that plaintiff had received from it the sum of $1200, and that the suit was dismissed as to it prior to the trial. Courts of this State have heretofore recognized that it is proper for a defendant to show the amount paid to a plaintiff by another defendant, who might be jointly liable, in consideration of the dismissal of the suit as to such de-

fendant. In the recent case of *Garvey v. Chicago Rys. Co.,* 339 Ill. 276, the court held that where a trial had been had and there was a verdict assessing the damages against *two* defendants, on a motion of the plaintiff to dismiss the suit as to one defendant after the case had been continued *for the hearing of arguments for a new trial,* it was error to refuse to allow the other defendant to make a showing *as to the terms of the dismissal.* . . . There is no doubt but that it was proper for the defendant, Sharkey to show the amount paid to plaintiff by the A. Vincent Sons Co., originally a codefendant. *It would seem to follow,* therefore, that it was also proper to instruct the jury on the *effect* of such payment. We perceive no sufficient reason, therefore, why the instructions in question should not have been given to the jury."

Counsel for plaintiff, on the other hand, contend that each of the three instructions was properly refused, and in support of their contention cite the case of *Devaney v. Otis Elevator Co.,* 251 Ill. 28. It appears from the opinion in that case that the action was for damages for personal injuries, originally brought by Devaney against the Elevator Co.; that by amendment the Standard Co. and one Harris were joined as defendants; that in consideration of $375 Devaney gave to the Elevator Co. a covenant not to further prosecute suit against it; that the suit thereafter proceeded against the Standard Co. and Harris, but was subsequently dismissed as to Harris; that upon a trial Devaney obtained a verdict and judgment for $2,000 against the Standard Co.; that the judgment was affirmed by the Appellate Court and subsequently by the Supreme Court. In the course of the opinion the court said (pp. 38, 39, italics ours):

"Plaintiff in error (Standard Co.) complains that the court erred in giving instruction No. 2 for defendant in error. This instruction, after stating the rule

for estimating the damages in case the defendant in error was entitled to recover, proceeds to inform the jury that from the amount of actual damages sustained should be deducted $375 paid by the Otis Elevator Co., provided the jury believe that the Otis Elevator Co. was jointly guilty with the plaintiff in error of the negligence that caused the injury; and the jury were also informed that if the Otis Elevator Co. was not guilty of negligence which approximately contributed to the injury, the $375 should not be deducted from the actual damages sustained by the defendant in error. *This instruction had no proper place in this case and should not have been given.* It improperly submits to the jury the issue as to whether the Otis Elevator Co. was guilty of negligence in connection with the injury when no such issue was made in the pleadings. The Otis Elevator Co. was not a party to this suit, and it was improper to submit the question of its responsibility for the injury to the jury by this instruction. The $375 paid the defendant in error by the Otis Elevator Co. *was not paid as part compensation* for the injury he received. It was paid for a covenant *not to further prosecute the suit against that company.* The jury had nothing to do with that question and the instruction should not have been given. The $375 paid by the Otis Elevator Co. *could not be considered by the jury in part payment of defendant in error's damages.* . . . The rule in regard to joint tort feasors is that each wrongdoer is responsible for the whole amount of damages, and that there is no such thing as apportioning the damages among joint wrongdoers. This instruction was improper and should not have been given, but we are of the opinion that it ought not to lead to a reversal of the judgment.''

In commenting upon the holdings and decision in the *Devaney* case counsel for Sharkey argue in their

reply brief in substance that the same are "complete-
ly out of harmony with decisions of the Federal Courts
and in most of the jurisdictions in the United States";
that the holdings in the opinion in the *Garvey* case
(which does not mention the *Devaney* case) are au-
thority for the proposition that "the consideration
paid by *one* of the two joint tort feasors *for a dismissal
after verdict* may be shown by the co-defendant in *mit-
igation of damages*"; and that, hence, it was revers-
ible error for the court in the present case to refuse
to give the three instructions in question, offered by
Sharkey. In view of the holdings in the *Devaney* case, as
to a somewhat similar instruction (which holdings, so
far as we are advised, have not been overruled or modi-
fied by our Supreme Court in any subsequent case) we
cannot agree with counsels' argument. And we do not
think that the holdings in the *Garvey* case are in point
as to the instant controversy (whether or not the trial
court committed reversible error in refusing to give
the said instructions). The controversy in the *Garvey*
case arose after a verdict had been rendered and dur-
ing argument on the motion for a new trial. In the
opinion in that case it is said (339 Ill. 286): "The
terms of the offer made by counsel for plaintiff in
error in the present case were sufficiently specific in
their nature to enable the court to see that the proof
contemplated by the offer, if made, would have a
direct bearing either upon the amount of damages re-
coverable against plaintiff in error (citing *City of Chi-
cago v. Babcock*, 143 Ill. 358; *O'Neill v. National Oil
Co.*, 231 Mass. 20), or upon the question of the further
liability of plaintiff in error. (Citing *Wallner v. Chi-
cago Traction Co.*, 245 Ill. 148.)" In the present case
there was evidence, introduced before the jury, by
stipulation, that the plaintiff "has already received,
*on account of this law suit*, . . . the sum of $1,200,"
and there is nothing in the present record to suggest

that the jury, in rendering its small verdict in plaintiff's favor of $2,500, did not take into consideration said sum so received by plaintiff. And we conclude that the trial court did not commit reversible error in refusing to give said three instructions or any one of them.

The judgment of the superior court of November 4, 1933, in favor of plaintiff for $2,500, should be affirmed, and it is so ordered.

*Affirmed.*

SCANLAN and SULLIVAN, JJ., concur.